**LOUIS VUITTON MALLETIER, S.A., Plaintiff,**

v.

**MY OTHER BAG, INC., Defendant.**

**14-CV-3419 (JMF)**

United States District Court, S.D. New York.

Signed January 6, 2016

---

1. This dismissal does not prejudice Brea's right to file a future habeas petition.

Jonathan Daniel Lupkin, Lupkin & Associates PLLC, Melissa Yang, Rakower

**430**

Lupkin PLLC, New York, NY, Owen Harris Smith, Robert E. Shapiro, Wendi Elizabeth Sloane, Hannah Yeon Mee Jurowicz, Sharon Eve Calhoun, Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg, L.L.P., Chicago, IL, for Plaintiff.

Brian J. Philpott, Corey A. Donaldson, Koppel, Patrick, Heybl & Philpott, Kevin Andrew Kent, Rincon Venture Law Group, Westlake Village, CA, David S. Korzenik, Terence Patrick Keegan, Miller Korzenik Sommers LLP, New York, NY, for Defendant.

## OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

Defendant My Other Bag, Inc. ("MOB") sells simple canvas tote bags with the text "My Other Bag . . ." on one side and drawings meant to evoke iconic handbags by luxury designers, such as Louis Vuitton, Chanel, and Fendi, on the other. MOB's totes—indeed, its very name—are a play on the classic "my other car . . ." novelty bumper stickers, which can be seen on inexpensive, beat up cars across the country informing passersby—with tongue firmly in cheek—that the driver's "other car" is a Mercedes (or some other luxury car brand). The "my other car" bumper stickers are, of course, a joke—a riff, if you will, on wealth, luxury brands, and the social expectations of who would be driving luxury and non-luxury cars. MOB's totes are just as obviously a joke, and one does not necessarily need to be familiar with the "my other car" trope to get the joke or to get the fact that the totes are meant to be taken in jest.

Louis Vuitton Malletier, S.A. ("Louis Vuitton"), the maker of Louis Vuitton bags, is perhaps unfamiliar with the "my other car" trope. Or maybe it just cannot take a joke. In either case, it brings claims against MOB with respect to MOB totes that are concededly meant to evoke iconic Louis Vuitton bags. More specifically, Louis Vuitton brings claims against MOB for trademark dilution and infringement under the Lanham Act, 15 U.S.C. § 1125(c); a claim of trademark dilution under New York law; and a claim of copyright infringement. MOB now moves for summary judgment on all of Louis Vuitton's claims; Louis Vuitton cross moves for summary judgment on its trademark dilution claims and its copyright infringement claim, and moves also to exclude the testimony of MOB's expert and to strike the declarations (or portions thereof) of MOB's expert and MOB's founder and principal. For the reasons that follow, MOB's motion for summary judgment is granted and Louis Vuitton's motions are all denied.

## BACKGROUND

The relevant facts, taken from the Complaint and admissible materials submitted in connection with the pending motions, are either undisputed or described in the light most favorable to Louis Vuitton. *See Costello v. City of Burlington,* 632 F.3d 41, 45 (2d Cir.2011). Louis Vuitton is a world-renowned luxury fashion house known for its high-quality handbags and other luxury goods. (Local Civil Rule 56.1 Statement Material Facts Louis Vuitton Malletier, S.A. Mot. Summ. J. (Docket No. 65) ("Louis Vuitton SOF") ¶ 2). Louis Vuitton bags often sell for thousands of dollars (*see* Def. My Other Bag's Statement Undisputed Material Facts Pursuant Local Civil Rule 56.1 (Docket No. 53) ("MOB SOF") ¶ 13), and the company invests substantial sums in creating and maintaining a sense of exclusivity and luxury, (*see id.* ¶ 14). As a result, several of Louis Vuitton's designs and trademarks are famous and well-recognized icons of wealth and expensive taste. In particular, Louis Vuitton's Toile Monogram design—"a repeating pattern featuring the interlocking, stylized letters 'L' and 'V' and three stylized flower de-

signs" (Louis Vuitton SOF ¶ 3), depictions of which appear in an appendix to this Opinion ("Op. App.") (*see* Op. App., Figs. A-B)—has become "the defining signature of the Louis Vuitton brand," (Louis Vuitton SOF ¶ 4). Louis Vuitton has registered trademarks in the Toile Monogram (*id.* ¶ 6) and in the component stylized flower designs, (*id.* ¶ 7). Two other iconic Louis Vuitton designs, the Monogram Multicolore and the Damier, have achieved comparable levels of recognition and are also registered as trademarks. (*See id.* ¶¶ 9-21). By all accounts, and as the discussion below will make clear, Louis Vuitton aggressively enforces its trademark rights. (*Id.* ¶ 35).

MOB was founded by Tara Martin in 2011. (MOB SOF ¶ 11). As noted, the name "My Other Bag" was inspired by novelty bumper stickers, which can sometimes be seen on inexpensive cars claiming that the driver's "other car" is an expensive, luxury car, such as a Mercedes. (Decl. Tara Martin Supp. Def.'s Mot. Summ. J. (Docket No. 52) ¶ 3). MOB produces and sells canvas tote bags bearing caricatures of iconic designer handbags on one side and the text "My Other Bag ..." on the other. Several of MOB's tote bags—one of which is depicted in the appendix to this Opinion (*see* Op. App., Figs. C-D)—display images concededly designed to evoke classic Louis Vuitton bags. (*See* MOB SOF ¶¶ 21-22; Louis Vuitton SOF ¶¶ 55-59, 79-80). As the appendix illustrates, the drawings use simplified colors, graphic lines, and patterns that resemble Louis Vuitton's famous Toile Monogram, Monogram Multicolore, and Damier designs, but replace the interlocking "LV" and "Louis Vuitton" with an interlocking "MOB" or "My Other Bag." (*See also id.* ¶¶ 47, 49). MOB markets its bags as "[e]co-friendly, sustainable tote bags playfully parodying the designer bags we love, but practical enough for everyday life." (Decl. Sharon Calhoun Supp. Mot. Summ. J. Louis Vuitton Malletier, S.A.

(Docket No. 66) ("Calhoun Decl."), Ex. 25 at LVMA7194). While Louis Vuitton sells its handbags for hundreds, if not thousands, of dollars apiece, MOB's totes sell at prices between thirty and fifty-five dollars. (Louis Vuitton SOF ¶ 42). Its website and other marketing play up the idea that high-priced designer bags cannot be used to carry around, say, dirty gym clothes or messy groceries, while its casual canvas totes can. (Calhoun Decl., Ex. 25 at LVMA7190-LVMA7192 ("[T]his luncheon worthy designer bag doesn't fit in at the gym, BUT My Other Bag ... DOES ...."); *see also* Louis Vuitton SOF ¶ 65).

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir.2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir.2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548); *accord PepsiCo,*

*Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir.2002) (per curiam).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir.2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir.2004). When, as in this case, both sides move for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir.2011). Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993).

To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir.1996) (citation omitted). Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

As noted, Louis Vuitton asserts three categories of claims against MOB. First, Louis Vuitton brings trademark dilution claims under both New York and federal law. (Compl. (Docket No. 2) ¶¶ 73-80, 87-92). Second, Louis Vuitton alleges that MOB's totes infringe its trademarks under federal law. (*Id.* ¶¶ 58-72). And third, Louis Vuitton contends that MOB's totes violate federal copyright law. (*Id.* ¶¶ 81-86). The Court will address each in turn.

### A. Trademark Dilution

Louis Vuitton's principal claim is that MOB is liable for trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c), and New York General Business Law § 360-*l*. The concept of trademark dilution has been described as a "subtle" one, *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 521–22 (S.D.N.Y. 2008), *aff'd in part, reversed in part on other grounds*, and calls for some explanation. "When an individual encounters a mark (*e.g.*, a word or symbol) in a store or watching a commercial, he or she can develop an association between a product or service and its corresponding quality, brand reputation, or origin." 1A Lindey on Entertainment, Publishing and the Arts § 2:52.50 (3d ed., updated Jan. 2016). Anti-dilution laws protect those acquired associations from being diluted by other uses of a plaintiff's trademark. In particular, dilution by blurring—the claim that Louis Vuitton pursues here—refers to the gradual diminishment of a famous mark's acquired "ability . . . to clearly and unmis-

takably distinguish one source through unauthorized use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir.1996) (alteration in original) (internal quotation marks omitted); *see also Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977) (observing that New York law protects against the "gradual whittling away of a firm's distinctive trade-mark or name").[1] In other words, "dilution occurs when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular." H.R. Rep. No. 109-23, at 4 (2005), *as reprinted in* 2006 U.S.C.C.A.N. 1091, 1092.

■ The classic case of dilution by blurring involves an unrelated product coopting a famous name or trademark as its own—"hypothetical anomalies" such "as Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 106 (2d Cir.2009) ("*Starbucks Corp. I*") (internal quotation marks omitted); *see also Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir.2010) (giving "Tylenol snowboards, Netscape sex shops and Harry Potter dry cleaners" as examples of dilution by blurring (internal quotation marks omitted)). In each of those cases, the new use of the famous trademark may cause "consumers [to] form new and different associations with the plaintiff's mark," thereby diluting the value of that mark. *Visa Intern.*, 610 F.3d at 1090. For example, "the owner of a trademark for a famous handbag could sue another company that begins using the trademark

to refer to laundry detergent." H.R. Rep. No. 112-647, at 5 (2012), *as reprinted in* 2012 U.S.C.C.A.N. 559, 562; *see also Hormel*, 73 F.3d at 506 ("The legislative history of § 368–d ... giv[es] examples of hypothetical violations: 'DuPont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth.' " (quoting 1954 N.Y. Legis. Ann. 49-50)). In that example, the laundry detergent's use of the handbag's trademark would diminish the trademark's ability to "clearly and unmistakably" identify the handbag. Over time, consumers might come to identify the trademark interchangeably with both the detergent and the handbag, "whittling away" the distinctiveness and value of the handbag maker's mark. *See Visa Int'l*, 610 F.3d at 1090 ("[D]ilution by blurring ... occurs when a mark previously associated with one product also becomes associated with a second.").

■ To succeed on a dilution claim under federal law, a plaintiff "must prove (1) that the trademark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of dilution ... as a result of 'blurring.' " *Ergowerx Int'l, LLC v. Maxell Corp. of Am.*, 18 F.Supp.3d 430, 451 (S.D.N.Y.2014) (quoting *Strange Music, Inc. v. Strange Music, Inc.*, 326 F.Supp.2d 481, 496 (S.D.N.Y.2004)). A plaintiff need not show economic injury. *See* 15 U.S.C. § 1125(c) (providing for liability "regardless of the presence or absence ... of actual economic injury"). New York law is similar, but does not require proof that the plaintiff's mark is famous. *See Hormel*, 73 F.3d at 505–06. In assessing whether dilution by blurring is likely to occur under

---

**1.** Under federal and New York law, a trademark owner can also pursue a claim of dilution by tarnishment. *See, e.g., Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir.1994) (" 'Tarnishment' generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwhole-

some or unsavory context likely to evoke unflattering thoughts about the owner's product."). In this case, Louis Vuitton alleges only dilution by blurring. (Mem. Pl. Louis Vuitton Malletier, S.A. Supp. Mot. Summ. J. (Docket No. 64) ("Louis Vuitton's Mem.") 10).

federal law, a court "may consider all relevant factors," including the following six statutorily enumerated factors: (1) the degree of similarity between the challenged mark and the famous mark; (2) the degree of distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark or trade name intended to create an association with the famous mark; and (6) any actual association between the mark or trade name and the famous mark. 15 U.S.C. § 1125(c)(2)(B). The analysis, however, "must ultimately focus on whether an association, arising from the similarity between the subject marks, impairs the distinctiveness of the famous mark"—that is, the ability of the famous mark to serve as a unique identifier. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 204 (2d Cir.2013) ("*Starbucks Corp. II*") (internal quotation marks omitted); *see also N.Y. Stock Exch. v. N.Y., N.Y. Hotel LLC*, 293 F.3d 550, 558 (2d Cir.2002). Under New York law, courts look to a similar set of factors: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *N.Y. Stock Exch.*, 293 F.3d at 558. But again, those factors are only guideposts: The ultimate question under New York law is whether there is a likelihood that

the capacity of the senior owner's mark "to serve as a unique identifier of its source" will be diminished. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 561 F.Supp.2d 368, 393 (S.D.N.Y.2008).[2]

■■■■ Significantly, federal law provides that certain uses of a mark "shall not be actionable as dilution by blurring," including:

> Any fair use ... of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with ... identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

15 U.S.C. § 1125(c)(3).[3] The statute does not define "parody," but courts have explained that a "parody" is "a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner." *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir.2007) ("*Haute Diggity Dog*"). "A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 494 (2d Cir.1989). The latter message "must not only differentiate the alleged parody from the original but must also

---

**2.** MOB contends that, under the Lanham Act, a plaintiff may bring a trademark dilution claim only where the defendant uses the plaintiff's mark to designate the source of its goods—that is, as a mark—and that it does not use Louis Vuitton's marks in that manner. (MOB's Mem. 5-9). The "mark-versus-mark" theory finds support in at least one prominent authority, *see* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:122 (4th ed., updated Dec. 2015), but the Court need not decide its validity in this case.

**3.** Although New York law does not include an analogous "fair use" provision, New York anti-dilution law is "substantively similar" to federal law, such that claims under the two laws "may be analyzed together." *Tiffany*, 576 F.Supp.2d at 523. Accordingly, courts have held that when a defendant establishes fair use for purposes of federal law, related state law claims also fail. *See JA Apparel Corp. v. Abboud*, 682 F.Supp.2d 294, 317 (S.D.N.Y. 2010).

communicate some articulable element of satire, ridicule, joking, or amusement." *Haute Diggity Dog*, 507 F.3d at 260; *see Cliffs Notes*, 886 F.2d at 496 (stating that a work "is a parody if, taken as a whole, it pokes fun at its subject"); *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 (10th Cir.1987) ("A parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect.").

**1. Fair Use**

 Applying the foregoing standards here, the Court concludes as a matter of law that MOB's bags are protected as fair use—in particular, that its use of Louis Vuitton's marks constitutes "parody." As noted, a successful parody communicates to a consumer that "an entity separate and distinct from the trademark owner is poking fun at a trademark or the policies of its owner." 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:153 (4th ed., updated Dec. 2015) ("McCarthy"). In other words, a parody clearly indicates to the ordinary observer "that the defendant is not connected in any way with the owner of the target trademark." *Id.* That is precisely what MOB's bags communicate. Indeed, the whole point is to play on the well-known "my other car ..." joke by playfully suggesting that the carrier's "*other bag*"—that is, *not* the bag that he or she is carrying—is a Louis Vuitton bag. That joke—combined with the stylized, almost cartoonish renderings of Louis Vuitton's bags depicted on the totes—builds significant distance between MOB's inexpensive workhorse totes and the expensive handbags they are meant to evoke, and invites an amusing comparison between MOB and the luxury status of Louis Vuitton. Further, the image of exclusivity and refinery that Louis Vuitton has so carefully cultivated is, at least in part, the brunt of the joke: Whereas a Louis Vuitton handbag is

something wealthy women may handle with reverent care and display to communicate a certain status, MOB's canvas totes are utilitarian bags "intended to be stuffed with produce at the supermarket, sweaty clothes at the gym, or towels at the beach." (Mem. Law Def. My Other Bag, Inc. Supp. Mot. Summ. J. (Docket No. 56) ("MOB's Mem.") 24).

Louis Vuitton protests that, even if MOB's totes are a parody of *something*, they are not a parody of its handbags and, relatedly, that MOB's argument is a *post hoc* fabrication for purposes of this litigation. (Louis Vuitton's Mem. 17-20, 23). The company notes that MOB's Chief Executive Officer, Tara Martin, has referred to its bags as "iconic" and stated that she never intended to disparage Louis Vuitton. (*Id.* at 18–19; *see also* Calhoun Decl., Ex. 25, at LVMA0001390 (MOB website describing its bags as "an ode to handbags women love"). Thus, Louis Vuitton argues, the "My Other Bag ..." joke mocks only MOB itself or, to the extent it has a broader target, "any humor is merely part of a larger social commentary, not a parody directed towards Louis Vuitton or its products." (*Id.* at 19). In support of those arguments, Louis Vuitton relies heavily on its victory in an unpublished 2012 opinion from this District: *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10–CV–1611 (PKC), 2012 WL 1022247 (S.D.N.Y. Mar. 22, 2012). In that case, Hyundai aired a thirty-second commercial titled "Luxury," which included "a four-second scene of an inner-city basketball game played on a lavish marble court with a gold hoop." *Id.* at *1. The scene also included a basketball bearing marks meant to evoke the Louis Vuitton Toile Monogram. *See id.* The Court rejected Hyundai's parody defense based in large part on deposition testimony from Hyundai representatives that conclusively established that the car company had no intention for

the commercial to make any statement about Louis Vuitton *at all. See id.* at *17–19 (excerpting deposition testimony establishing that Hyundai did not mean to "criticize" or "make fun of" Louis Vuitton, or even "compare the Hyundai with [Louis Vuitton]"). On the basis of that testimony, the Court concluded that Hyundai had "disclaimed any intention to parody, criticize or comment upon Louis Vuitton" and that the ad was only intended to make a "broader social comment" about "what it means for a product to be luxurious." *Id.* at *17 (internal quotation marks omitted).

The *Hyundai* decision is not without its critics, *see, e.g.*, 4 McCarthy § 24:120, but, in any event, this case is easily distinguished on its facts. Here, unlike in *Hyundai*, it is self-evident that MOB did mean to say something about Louis Vuitton specifically. That is, Louis Vuitton's handbags are an integral part of the joke that gives MOB its name and features prominently on every tote bag that MOB sells. In arguing otherwise, Louis Vuitton takes too narrow a view of what can qualify as a parody. The quip "My Other Bag ... is a Louis Vuitton," printed on a workhorse canvas bag, derives its humor from a constellation of features—including the features of the canvas bag itself, society's larger obsession with status symbols, *and* the meticulously promoted image of expensive taste (or showy status) that Louis Vuitton handbags have, to many, come to symbolize. The fact that MOB's totes convey a message about more than *just* Louis Vuitton bags is not fatal to a successful parody defense. *See Campbell v. Acuff–Rose Music, Inc.*, 510

U.S. 569, 580, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (holding that a copyright parodist must show that his parody, *"at least in part*, comments on [the parodied] author's work" (emphasis added)); *Harley–Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 (2d Cir.1999) (applying that standard to trademark parody). And the fact that Louis Vuitton at least does not find the comparison funny is immaterial; Louis Vuitton's sense of humor (or lack thereof) does not delineate the parameters of its rights (or MOB's rights) under trademark law. *See, e.g., Cliffs Notes*, 886 F.2d at 495–96 ("[T]he district court apparently thought that the parody here had to make an obvious joke out of the cover of the original in order to be regarded as a parody. We do not see why this is so. It is true that some of the covers of the parodies brought to our attention, unlike that of [the defendant], contain obvious visual gags. But parody may be sophisticated as well as slapstick; a literary work is a parody if, taken as a whole, it pokes fun at its subject." (footnote omitted)); *cf. Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F.Supp. 267, 280 (S.D.N.Y.1992) ("Although [the defendant's] position would probably be stronger if its joke had been clearer, the obscurity of its joke does not deprive it of First Amendment support. First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed.").[4]

In those regards, another decision from this District, *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d

---

4. Even if *Hyundai* were not distinguishable, this Court would decline to follow it. In the Court's view, the *Hyundai* Court blurred the distinction between association and dilution. As discussed in more detail below, association is a necessary, but not sufficient, condition for a finding of dilution by blurring. *See, e.g., Moseley v. V Secret Catalogue, Inc.*, 537 U.S.

418, 433, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003) ("[T]he mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution. ... [S]uch mental association will not necessarily reduce the capacity of the famous mark to identify the goods of its owner.").

410, 415 (S.D.N.Y.2002), is more on point. That case involved a line of parody perfume products for use on pets. In particular, the defendant had created a pet perfume called Tommy Holedigger, which resembled a Tommy Hilfiger fragrance in name, scent, and packaging. *See id.* at 412–413. Hilfiger, like Louis Vuitton here, argued (albeit in connection with a claim of trademark infringement rather than dilution) that the defendant was not entitled to protection as a parody because "its product admittedly makes no comment about Hilfiger." *Id.* at 415. In support of that argument, Hilfiger cited testimony from the defendant's general partner that his product was not intended to make any comment about Hilfiger or its products. *See id.* Noting that the general partner had also testified that "he was intending to create a 'parody ... target[ing] ... Tommy Hilfiger,' 'a fun play on words,' or 'spoof ... [t]o create enjoyment, a lighter side,'" Judge Mukasey rejected Hilfiger's argument as follows:

Although [the general partner] had difficulty expressing the parodic content of his communicative message, courts have explained that:

Trademark parodies ... do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.

*Id.* (quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 34 (1st Cir. 1987)). He added, in a comment that applies equally well here: "One can readily see why high-end fashion brands would be ripe targets for such mockery." *Id.*

Alternatively, relying principally on *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979), Louis Vuitton argues that MOB's totes cannot be a parody because they do not need to use Louis Vuitton's trademarks for the parody to make sense. (Louis Vuitton's Mem. 21-22). Strictly speaking, that is true—to the extent that MOB could use any well-known luxury handbag brand to make its points. But, whereas the defendant in *Dallas Cowboys Cheerleaders*, a purveyor of a "gross and revolting sex film," 604 F.2d at 202, did not have to use anyone else's trademark—let alone the plaintiff's specific trademark—to make its point (allegedly, "comment[ing] on 'sexuality in athletics,'" *id.* at 206), the same cannot be said here. MOB's tote bags would not make their point, and certainly would not be funny, if the obverse of the tote merely depicted some generic handbag. Such a tote would confusingly communicate only that "my other bag ... is some other bag." In other words, Louis Vuitton's argument distorts any "necessity" requirement beyond recognition, and myopically suggests that, where a parody must evoke at least one of a finite set of marks in order to make its point, it can evoke none of them because reference to any *particular* mark in the set is not absolutely necessary. The Court declines to create such an illogical rule.

Finally, Louis Vuitton contends that the fair use exception does not apply to MOB's totes because MOB uses Louis Vuitton's trademarks "as a designation of source for [MOB's] own goods." (Louis Vuitton's Mem. 17-18). After all, Section 1125(c)(3), by its terms, protects "[a]ny fair use ... of a famous mark by another person *other than as a designation of source for the person's own goods or services*." 15 U.S.C.

§ 1125(c)(3) (emphasis added); *see also Haute Diggity Dog*, 507 F.3d at 266 ("Under the statute's plain language, parodying a famous mark is protected by the fair use defense only if the parody is *not* 'a designation of source for the person's own goods or services.' "). But given the overall design of MOB's tote bags (the identical, stylized text "My Other Bag ..." on one side and differing caricatures on the other side), and the fact that the bags evoke a range of luxury brands with different graphics, there is no basis to conclude that MOB uses Louis Vuitton's marks as a designation of *source* for its tote bags. Indeed, as noted, that is the whole point of MOB's joke: "My *other* bag"—that is, *not* this bag—is a Louis Vuitton handbag. That joke—not to mention the cartoon-like rendering of the bags—builds significant distance between the pattern incorporated into the bag sketches and the designated source of the totes themselves. Thus, MOB is not precluded from invoking the fair use provision.

Louis Vuitton's argument to the contrary rests on a single, mischaracterized citation to the record. (Louis Vuitton's Mem. 18). At her deposition, MOB CEO Martin was asked:

> Would you agree with me that these pictures that people see on [your totes] with whatever markings they have are things that you use to designate where the goods come from? They designate your company? ... [W]ould you agree with me that the depictions of Louis Vuitton bags that you use on those totes that have depictions of Louis Vuitton bags are depictions ... you use in order for people to understand that the product comes from you, My Other Bag?

(Calhoun Decl., Ex. 3 ("Martin Dep. Tr.") 88:23-89:1). Martin responded that, yes, "[p]eople know that the product ... our tote bags with those depictions come from My Other Bag." (*Id.*). That answer is not, as Louis Vuitton would have it, an admission that MOB used its marks to identify the source of MOB's tote bags. Given the context—namely, counsel's attempt to establish that consumers were likely to be confused about the origins of MOB's totes (*see id.* at 88–90, 99–101)—it is plain that Martin's sole point was that she did not believe that consumers were confused about who produces MOB's tote bags. Louis Vuitton does not point to any other evidence that would demonstrate that MOB uses Louis Vuitton's marks as designations of source for its own products or brand. (*See* Mem. Pl. Louis Vuitton Malletier, S.A. Resp. Mot. Summ. J. My Other Bag, Inc. (Docket No. 86) ("Louis Vuitton's Opp'n") 4-5).

### 2. Dilution by Blurring

 In short, MOB's use of Louis Vuitton's marks qualifies as fair use as a matter of law under Section 1125(c)(3). But even if it did not—if, for example, MOB did use Louis Vuitton's marks as a designation of source—MOB would still be entitled to summary judgment on Louis Vuitton's dilution claims because the tote bags pose no danger of impairing the distinctiveness of Louis Vuitton's marks. As noted above, to succeed on its dilution claims—under both federal and New York law—Louis Vuitton must show that MOB's bags are likely to blur Louis Vuitton's marks' "ability ... to clearly and unmistakably distinguish one source" as a unique identifier. *Hormel Foods*, 73 F.3d at 506 (internal quotation marks omitted).[5]

---

**5.** Under federal (but not New York) law, Louis Vuitton also has to show "that the trademark is truly distinctive or has acquired secondary meaning." *Ergowerx*, 18 F.Supp.3d at 451 (quoting *Strange Music, Inc. v. Strange* *Music, Inc.*, 326 F.Supp.2d 481, 496 (S.D.N.Y.2004)). Here, there is—and can be—no dispute that Louis Vuitton's trademarks are famous and distinctive. (*See* MOB's Mem. 1-2, 5).

Significantly, it is not enough to show—as Louis Vuitton indisputably can—that members of the public are likely to "associate" the defendant's mark with the plaintiff's mark (or that the defendant promotes such association). Under the statute,

"association" is a necessary condition of, but not equivalent to, dilution by blurring .... Even if there is proof of a likely association, that does not mean that there is also a likelihood of dilution by ·blurring. ... The statute explicitly requires proof of the likelihood that this defendant's use "impairs the distinctiveness of the famous mark."

4 McCarthy § 24:116; *see also Moseley*, 537 U.S. at 433, 123 S.Ct. 1115. Thus, the operative question is whether the *kind* of association MOB creates here is likely to impair the distinctiveness of Louis Vuitton's marks.

With respect to that question, the Fourth Circuit's decision in *Haute Diggity Dog*—ironically, also involving Louis Vuitton—is highly instructive. In *Haute Diggity Dog*, Louis Vuitton brought a trademark dilution claim against the manufacturer of pet toys with names that humorously evoked various high-end brands, including a chew toy for dogs—a small, plush purse decorated with a Toile Monogram-esque pattern—called "Chewy Vuiton." 507 F.3d at 258. The Court held that the fair use exception for parodies in Section 1125(c)(3) did not apply because the defendant used Louis Vuitton's mark as a designation of source for its own goods. *See id.* at 266. Nevertheless, the Court continued, federal law "does not require a court to ignore the existence of a parody that is used as a trademark, and it does not preclude a court from considering parody as part of the circumstances to be considered for determining whether the plaintiff has made out a claim for dilution by blurring." *Id.* at 266–67. To the contrary, the statute calls for consideration of " 'all relevant factors,' including

the six factors supplied in § 1125(c)(2)(B)," with respect to several of which the use of a mark as parody is "specifically relevant." *Id.* at 267. The Fourth Circuit explained:

For example, factor (v) (whether the defendant intended to create an association with the famous mark) and factor (vi) (whether there exists an actual association between the defendant's mark and the famous mark) directly invite inquiries into the defendant's intent in using the parody, the defendant's actual use of the parody, and the effect that its use has on the famous mark. While a parody intentionally creates an association with the famous mark in order to be a parody, it also intentionally communicates, if it is successful, that it is *not* the famous mark, but rather a satire of the famous mark. That the defendant is using its mark as a parody is therefore relevant in the consideration of these statutory factors.

Similarly, factors (i), (ii), and (iv)—the degree of similarity between the two marks, the degree of distinctiveness of the famous mark, and its recognizability—are directly implicated by consideration of the fact that the defendant's mark is a successful parody. Indeed, by making the famous mark an object of the parody, a successful parody might actually enhance the famous mark's distinctiveness by making it an icon. The brunt of the joke becomes yet more famous.

*Id.* (citation omitted). The Fourth Circuit concluded that the owner of a famous mark such as Louis Vuitton therefore had "an increased burden to demonstrate that the distinctiveness of its famous marks is likely to be impaired by a successful parody." *Id.* Louis Vuitton failed to carry that burden. "Haute Diggity Dog," the Court reasoned, "mimicked" Louis Vuitton's "fa-

mous marks," but "did not come so close to them as to destroy the success of its parody and, more importantly, to diminish the [Louis Vuitton] marks' capacity to identify a single source." *Id.* at 268. That is, although "Haute Diggity Dog intentionally associated its marks," it did so "only partially and certainly imperfectly, so as to convey the simultaneous message that it was not in fact a source of [Louis Vuitton] products. Rather, as a parody, it separated itself from the [Louis Vuitton]. marks in order to make fun of them." *Id.* at 268.

The Court agrees with the Fourth Circuit's analysis in *Haute Diggity Dog*, and reaches the same conclusion in this case for substantially the same reasons. *See also Starbucks Corp. I*, 588 F.3d at 112–13 (quoting at length from *Haute Diggity Dog*, but ultimately withholding judgment on whether to adopt the Fourth Circuit's "parody holding"). Here, as in *Haute Diggity Dog*, "when considering factors (ii), (iii), and (iv), it is readily apparent ... that [Louis Vuitton's] marks are distinctive, famous, and strong." 507 F.3d at 267. But as in *Haute Diggity Dog*, that fame and recognition only make it *less likely* that MOB's use would impair the distinctiveness of Louis Vuitton's marks. *See id.* Nor is there any serious question that the drawings on MOB's totes are similar to Louis Vuitton's bags (factor (i)) in a way that was intended to create an association with Louis Vuitton's bags (factors (v) and (vi)). But while MOB deliberately uses, or at least evokes, Louis Vuitton's trademarks, it does so in a way quite different from the hypothetical seller of "Buick aspirin tablets." *See Starbucks Corp. I*, 588 F.3d at 105. Instead, MOB "intentionally associated its marks, but only partially and

certainly imperfectly, so as to convey the simultaneous message that it was not in fact a source of [Louis Vuitton] products." *Haute Diggity Dog*, 507 F.3d at 268. In fact, if anything, MOB distances itself from Louis Vuitton even more than Haute Diggity Dog did, as the very point of the "my other bag" gimmick is that the MOB tote is *not* a Louis Vuitton handbag. Thus, "when considering the relevant factors to determine whether blurring is likely to occur in this case," the Court "readily come[s] to the conclusion," as the Fourth Circuit did in its case, "that [Louis Vuitton] has failed to make out a case of trademark dilution by blurring by failing to establish that the distinctiveness of its marks was likely to be impaired" by MOB's marketing and sale of its products. *Id.*

## B. Trademark Infringement

Next, the Court turns to Louis Vuitton's trademark infringement claims.[6] "The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir.2004) (internal quotation marks and alterations omitted). To determine whether there is a likelihood of confusion, courts in this Circuit apply the eight-factor balancing test first articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.1961). The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness

---

6. Louis Vuitton's Complaint also raises a claim for false designation of source. (*See* Compl. ¶¶ 67-72). As discussed above, MOB does not use Louis Vuitton's trademarks as a designation of source. In any event, false designation of source claims, like trademark infringement claims, require a plaintiff to demonstrate a likelihood of consumer confusion. *See Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir.1994). As explained in this section, Louis Vuitton cannot meet that burden.

with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market. *See Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir.2005). But much like application of the statutory factors used to evaluate trademark dilution claims, application of the *Polaroid* test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Id.* Furthermore, as the Second Circuit has recognized, normal application of the *Polaroid* test, which developed in the context of "purely commercial exploitation," is "at best awkward in the context of parody, which must evoke the original and constitutes artistic expression." *Cliffs Notes*, 886 F.2d at 495 n. 3.

■ Applying the *Polaroid* factors here, the Court concludes that Louis Vuitton's infringement claims fail for much the same reasons that its dilution claims failed. *See Tommy Hilfiger*, 221 F.Supp.2d at 422 (noting that "many of the factors" relevant to the likelihood of dilution are "also relevant" to the likelihood of confusion). Beginning with the first factor—the strength of Louis Vuitton's trademark—it is undisputed (indeed, indisputable) that Louis Vuitton's marks are famous. (*See* Louis Vuitton SOF ¶¶ 1-2). "In the usual trademark case, a strong mark is a factor pointing toward a likelihood of confusion. However, where the plaintiff's mark is being used as part of a jest ... the opposite can be true. The strength and recognizability of the mark may make it easier for the audience to realize that the use is a parody and a joke on the qualities embodied in trademarked word or image." *Tommy Hilfiger*, 221 F.Supp.2d at 416 (internal quotation

marks, brackets, and citations omitted); *see also Haute Diggity Dog*, 507 F.3d at 261 ("It is a matter of common sense that the strength of a famous mark allows consumers immediately to perceive the target of the parody, while simultaneously allowing them to recognize the changes to the mark that make the parody funny or biting"). Such is the case here: Louis Vuitton's marks are so well known that consumers are likely "both immediately to recognize the target of the joke and to appreciate the obvious changes to the marks that constitute the joke." *Tommy Hilfiger*, 221 F.Supp.2d at 416. In that way, the distinctiveness of Louis Vuitton's mark favors MOB—or, at most, is neutral.

■ As for the similarity of the marks, "an inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves." *Hormel Foods*, 73 F.3d at 503 (internal quotation marks omitted). Instead, "[o]ne must also look to context, because 'the setting in which a designation is used affects its appearance and colors the impression conveyed by it.'" *Tommy Hilfiger*, 221 F.Supp.2d at 417 (quoting *Hormel Foods*, 73 F.3d at 503). Viewed in that way, the second *Polaroid* factor also favors MOB. There are, to be sure, similarities—intended similarities—between the bag-within-a-bag depicted on MOB's tote bags and Louis Vuitton's marks. (*Compare* Op. App., Fig. B *with* Op. App., Figs. C-D). At the same time, there are obvious differences: MOB's depiction is cartoonish; "MOB" is substituted for the well-known interlocking "LV"; and the drawing appears on only one side of a workhouse canvas bag, with the name of the company ("My Other Bag ...") printed in large letters on the other side followed by an ellipsis, inviting the observer to complete the joke. Those differences, "together with the context and overall setting ... convey

to the ordinary viewer that this is a joke, not the real thing," meaning that "confusion as to source, sponsorship, affiliation, or connection is unlikely." 6 McCarthy § 31:155.

The next two *Polaroid* factors—proximity of the products and likelihood that plaintiff will "bridge the gap"—also support MOB. Louis Vuitton argues that its handbags "are directly competitive" with MOB's totes and "attract similar consumers." (Louis Vuitton's Opp'n 23). In particular, Louis Vuitton argues that, just like MOB, many of Louis Vuitton's bags are "casual" and made of canvas. (*See* Louis Vuitton SOF ¶¶ 27-29). But that claim does not withstand even light scrutiny. As Louis Vuitton repeatedly emphasizes, the company "is a premier luxury fashion house" that sells "high quality handbags, luggage, apparel, and many other fashion and luxury goods." (Louise Vuitton's Mem. 2). Its handbags cost hundreds, if not thousands of dollars, and are "sold exclusively in Louis-Vuitton owned stores and on the e-commerce website, www.louisvuitton.com." (Louis Vuitton SOF ¶ 34; MOB SOF ¶ 13). By contrast, MOB's totes are sold on its website, www.myotherbag.com, and retail for only between thirty and fifty-five dollars. (*See, e.g.,* Calhoun Decl., Ex. 25, at LVMA0001303, LVMA0001470; Louis Vuitton SOF ¶ 42). In short, MOB's bags are in no meaningful sense "competitive" with Louis Vuitton's designer handbags. *See, e.g., Tommy Hilfiger,* 221 F.Supp.2d at 418 (finding that the third *Polaroid* factor favored the defendant because the plaintiff's and defendant's products, although similar in some respects, were "sold in different kinds of stores—the former in department or designer stores, the latter in pet stores or gift shops—at markedly different prices"); *accord Haute Diggity Dog,* 507 F.3d at 263. Nor has Louis Vuitton put forward any evidence suggesting that it plans to "bridge the gap" by selling casual parody totes at low price points.

The fifth factor, evidence of actual consumer confusion, also weighs in MOB's favor. In support of its argument to the contrary, Louis Vuitton points to a handful of instances in which people have described certain MOB totes as "LV" bags. (*See* Louis Vuitton SOF ¶¶ 81-85). Even if those descriptions were taken literally, a handful of instances is hardly strong evidence of actual consumer confusion. Moreover, there is reason not to take them literally: On their face, the comments are plainly using "LV" as a shorthand to describe the MOB tote designs that evoke Louis Vuitton bags. That is, the anecdotes do little more than indicate that consumers get the joke on MOB's totes; they do not suggest that any consumers actually believed MOB's totes were produced or sponsored by Louis Vuitton. Given that MOB's totes have been on the market for several years, the fact that Louis Vuitton cannot produce any actual evidence of consumer confusion suggests that MOB's use of Louis Vuitton's marks does "not cause a meaningful likelihood of confusion." *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 228 (2d Cir.1999), *abrogated on other grounds by Moseley,* 537 U.S. 418, 123 S.Ct. 1115; *see also Cohn v. Petsmart, Inc.,* 281 F.3d 837, 842-43 (9th Cir.2002) (per curiam) ("[S]ome evidence of actual confusion should have become available if [the defendant's] coexisting use had created a genuine likelihood of confusion."); *Tommy Hilfiger,* 221 F.Supp.2d at 419 ("Where, as here, a product has been on the market for several years, the absence of evidence on this point is considered a very significant deficiency." (internal quotation marks omitted)).

Contrary to Louis Vuitton's contention (Louis Vuitton Opp'n 24), the sixth factor—the defendant's bad faith—does not

count in its favor either. Louis Vuitton relies on the fact that MOB intentionally designed its totes to evoke Louis Vuitton's bags, as to which there is—and can be—no dispute. (*Id.*) In the context of parody, however, "[t]hat evidence ... does not show that defendant acted with the intent relevant in trademark cases—that is, an intent to capitalize on consumer deception or hitch a free ride on plaintiff's good will." *Tommy Hilfiger*, 221 F.Supp.2d at 419. Instead, in that context, "the intent is not necessarily to confuse the public but rather to amuse." *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 (10th Cir.1987). That is, "[t]he benefit to the one making the parody ... arises from the humorous association, not from public confusion as to the source of the marks." *Id.*; *see also, e.g., Tommy Hilfiger*, 221 F.Supp.2d at 419 ("The commercial success of a parodist's product is attributable to consumers who purchased because 'they were amused by the cleverness of its design,' and not because they believed it to be the original." (quoting *Anheuser–Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 322 (4th Cir.1992)). Thus, MOB's intent "to imitate and suggest, but not *use*, the marks of a high-fashion LOUIS VUITTON handbag" is not the sort of "bad faith" that cuts in favor of a finding of infringement under the *Polaroid* test. *Haute Diggity Dog*, 507 F.3d at 268; *cf. Jordache Enters.*, 828 F.2d at 1487 ("Our single concern here ... is whether an intent to parody an existing trademark supports an inference of a likelihood of confusion under the reasoning that one who chooses a mark similar to an existing mark intends to confuse the public. We hold that it does not." (citation omitted)).

Finally, the seventh and eighth *Polaroid* factors are either neutral or cut against Louis Vuitton. Louis Vuitton has not demonstrated that the lower quality of MOB's totes threatens to tarnish its trademark. *See Hormel Foods*, 73 F.3d at 505 ("[A]n inferior product may cause injury to the plaintiff trademark owner because people may think that the senior and junior products came from the same source."). And it is uncontroverted that MOB's totes are not of the same quality as Louis Vuitton's handbags in a way that might cause confusion as to source. (*See* Louis Vuitton's Opp'n 24-25). So the seventh factor, the quality of defendant's product, is at best a wash. The final factor considers the "sophistication of consumers and the degree of care likely to be exercised in purchasing the product." *Tommy Hilfiger*, 221 F.Supp.2d at 420. That factor favors MOB for two reasons. First, "[t]he substantial price" of Louis Vuitton's handbags "requires buyers to exercise care before they part with their money, and such sophistication generally militates against a finding of a likelihood of confusion." *Charles of Ritz Grp. Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1323 (2d Cir.1987). Second, MOB's gimmick would be obvious to even its most unsophisticated customers, as one whole side of the tote bag is blank except for the words "My Other Bag ...." (*See* Op. App., Fig. C). Because the joke is "obvious, even a minimally prudent customer would not be confused by the source or affiliation of [its products]. The purchasing public must be credited with at least a modicum of intelligence." *Tommy Hilfiger*, 221 F.Supp.2d at 420 (internal quotation marks omitted).

In sum, after considering all eight *Polaroid* factors and "looking at the products in their totality," *Star Indus.*, 412 F.3d at 384, the Court concludes that "there is no triable issue of fact on the likelihood of confusion. Rather, defendant's use of the mark is an obvious parody or pun, readily so perceived, and unlikely to cause confusion among consumers." *Tommy Hilfiger*, 221 F.Supp.2d at 420. Nor does Louis Vuitton point to any evidence that the public might think Louis Vuitton "sponsored or otherwise approved" of MOB's

bags. *See Star Indus.*, 412 F.3d at 383–84. Louis Vuitton suggests otherwise by hypothesizing the possibility of post-sale confusion—specifically, an observer who sees only the side of the MOB tote bag with the bag-within-the-bag image and fails to notice that "MOB" is substituted for "LV." (Louis Vuitton's Opp'n 24). The Second Circuit, however, has generally found post-sale confusion actionable only in the context of knockoffs, *see Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 108–09 (2d Cir.2000) (gathering cases), which is not the situation here. And in any event, the argument fails on the merits. For one thing, no reasonable observer is likely to infer from the cartoon-like bag-within-the-bag design and the juxtaposition of MOB's basic, canvas tote with the exclusive, luxury status of Louis Vuitton that Louis Vuitton sponsors or otherwise approves of MOB's tote bags. For another, the test is not whether there is a likelihood of confusion in a hypothetical scenario that is most likely to result confusion. Instead, the test is whether the "overall impression" created by the product in the "context in which [it is] found" would cause confusion among reasonable "prospective purchasers." *Star Indus.*, 412 F.3d at 386. The "overall impression" of MOB's totes in the "context in which" reasonable prospective purchasers would find them certainly includes both sides of the bag. And when the entirety of the bag is considered, there is no credible risk that a reasonably prudent consumer would think Louis Vuitton "sponsored or otherwise approved" of MOB's totes.

## C. Copyright Infringement

Finally, MOB moves for summary judgment with respect to Louis Vuitton's copyright infringement claim. The Court's conclusions above effectively compel the conclusion that any use by MOB of copyrightable elements of Louis Vuitton's prints qualifies as a matter of law as "fair

use." *See* 17 U.S.C. § 107 ("[F]air use of a copyrighted work ... is not an infringement of copyright."). Parody, like other forms of comment or criticism, "has an obvious claim to transformative value" and may therefore be "fair use" under the Copyright Act. *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. "For the purposes of copyright law, ... the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Id.* at 580, 114 S.Ct. 1164. Of course, not all parody is protected; instead, parody, "like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." *Id.* at 581, 114 S.Ct. 1164. Thus, in considering whether MOB's use of any copyrightable material is "fair," the Court must consider the totality of the circumstances, including the following factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational uses; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

Because Louis Vuitton "attempts to use a copyright claim to pursue what is at its core a trademark and trade dress infringement claim, application of the fair-use factors under the Copyright Act to these facts is awkward." *Haute Diggity Dog*, 507 F.3d at 269. Nevertheless, weighing the factors, the Court concludes that MOB's tote bags are protected by the fair use doctrine. First, although commercial use "tends to weigh against a finding of fair use," *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), it is not presumptively unfair. Parody, even when

done for commercial gain, can be fair use. *See Campbell*, 510 U.S. at 584–85, 114 S.Ct. 1164. The second factor, the nature of the copyrighted work, does not provide "much help ... in a parody case, since parodies almost invariably copy publicly known, expressive works." *Id.* at 586, 114 S.Ct. 1164. The third factor requires a court to assess whether " 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' ... are reasonable in relation to the purpose of the copying." *Id.* at 587, 114 S.Ct. 1164 (quoting 17 U.S.C. § 107(3)). Here, MOB's use of Louis Vuitton's patterns is reasonable in relation to the purpose of the use—after all, MOB's totes must successfully conjure Louis Vuitton's handbags in order to make sense. Finally, although MOB's totes are, in an abstract sense, in the same market as Louis Vuitton's handbags, its totes do not "serve[ ] as a market replacement for" Louis Vuitton's bags in a way that would make "it likely that cognizable market harm to [Louis Vuitton] will occur." *Id.* at 591, 114 S.Ct. 1164. Indeed, as discussed above, any reasonable observer would grasp that the whole point of MOB's invocation of the "my other car ..." trope is to communicate that MOB's totes are *not* replacements for Louis Vuitton's designer handbags. *See Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir.2013) ("What is critical [in evaluating a fair use defense] is how the work in question appears to the reasonable observer.").

## CONCLUSION

Louis Vuitton is, by its own description, an "active[ ] and aggressive[ ]" enforcer of its trademark rights. (Louis Vuitton SOF ¶ 35). In some cases, however, it is better to "accept the implied compliment in [a] parody" and to smile or laugh than it is to sue. *Tommy Hilfiger*, 221 F.Supp.2d at 412. This—like *Haute Diggity Dog* (and, arguably, *Hyundai*)—is such a case. MOB's use of Louis Vuitton's marks in service of what is an obvious attempt at humor is not likely to cause confusion or the blurring of the distinctiveness of Louis Vuitton's marks; if anything, it is likely only to reinforce and enhance the distinctiveness and notoriety of the famous brand. Accordingly, and for the reasons stated above, MOB is entitled to summary judgment on all of Louis Vuitton's claims; it follows that Louis Vuitton's own motion for partial summary judgment must be and is denied.

In addition, Louis Vuitton's motions to preclude the expert testimony of William Locander (Docket No. 70) and to strike all or portions of Locander's and MOB CEO Martin's declarations (Docket Nos. 82, 84) are denied as moot, as the Court did not rely on any of the disputed submissions in resolving the parties' summary judgment motions. Finally, Louis Vuitton's motions for oral argument (Docket No. 96) and for a conference regarding its motion to preclude expert testimony (Docket No. 101) are also denied as moot.

■■■ The Clerk of Court is directed to terminate Docket Nos. 50, 62, 70, 82, 84, 96, and 101 and to terminate this case.[7]

SO ORDERED.

---

7. Both parties filed some of their briefs under seal. Although there is a presumption in favor of public access to judicial documents, the Court does not reference or otherwise rely on sealed facts in reaching its decision. The weight of that presumption is, therefore, limited. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir.2016) ("[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir.1995))). As for competing considerations that counsel in favor of allowing the parties to file their briefs under

Appendix

Fig. A.—Louis Vuitton Toile Monogram

Fig. B.—Louis Vuitton SPEEDY® Toile Monogram

seal, the privacy interests of the parties in preventing the public disclosure of private business figures and communications are not insignificant. The Court therefore concludes that the balance of interests is in favor of allowing the parties' briefs to be filed under seal. Leave to file under seal is therefore granted.

Fig. C.—My Other Bag's Zoey—Tonal Brown Tote (Front)

448

Fig. D—My Other Bag's Zoey—Tonal Brown Tote (Back)